**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMPLIFYBIO, LLC, *et al.*,[1] | ) Case No. 25-52140 |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF KASEY ROSADO IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kasey Rosado, declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors," or the "Company").  The Debtors are a contract research and manufacturing organization focused on the development, characterization, and scalable manufacturing of advanced therapies, including cell and gene therapies, mRNA, and non-viral gene editing platforms. The Company established itself as a partner to biotechnology and pharmaceutical companies seeking to advance complex therapeutic products and novel early-phase drug development from discovery through the commercial manufacturing process.  Until recently, AmplifyBio was a trusted partner in driving therapeutic innovation and advancing drug pipelines, including the development of life-saving cancer medication, among others.

2.      As the Chief Restructuring Officer of the Debtors, I am responsible for, and am materially engaged with, the Debtors' operational and financial management including, among other things: (a) restructuring activities and initiatives of the Company; (b) cash management and liquidity forecasting; (c) the development of, or revisions to, the Company's business plan,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: AmplifyBio, LLC (1671); and ADOC SSF, LLC (3792). The corporate headquarters and the mailing address for the Debtors is 1425 NE Plain City-Georgesville Road, West Jefferson, Ohio 43162.

including assistance with the sale process described herein; (d) engagement with creditors and other stakeholders; and (e) contingency planning.

3.      In February 2025, the Debtors engaged my firm Accordion Partners, LLC ("Accordion") to provide restructuring advisory services, and the Debtors appointed me as Chief Restructuring Officer in March 2025.  I am a senior managing director with Accordion.  I have more than twenty years of financial restructuring, interim management, turnaround, and management consulting experience. I have been involved in many aspects of the restructuring process, including the development and evaluation of strategic business plans, the implementation of liquidity management strategies, and advising on numerous out-of-court and chapter 11 bankruptcy cases.

4.      Before joining Accordion, I was a senior managing director at Ankura, a restructuring and consulting firm.  I was also previously a managing director at CDG Group, where I specialized in advising clients in evaluating, developing, and executing financial and strategic alternatives, including business and organizational realignment, product repositioning, financial measurement and benchmarking, debt capacity assessment, and refinancing.  Prior to CDG Group, I was with PricewaterhouseCoopers where I specialized in assisting companies and their creditors in financial restructurings and operational turnarounds.  I hold a Bachelor of Science in Accounting from Syracuse University - Martin J. Whitman School of Management.

5.      Except as otherwise indicated, I base all facts set forth in this declaration (this "Declaration") on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtors.

#36211962v1
36211997.1

6.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Ohio (the "Court") to, among other things, pursue a value-maximizing chapter 11 process through which the sale proceeds and other available proceeds will be distributed in accordance with the Bankruptcy Code.

7.      As discussed in further detail below, these chapter 11 cases were necessitated by the Debtors' growing lack of resources and operational challenges, as the Debtors were unable to service their secured debt and generate sustainable revenue. Ultimately, the Debtors have not been able to sustain liquidity to counteract the heavy burden of their obligations to creditors, and the Debtors have only reached the Petition Date after continually working through numerous cost-cutting and restructuring efforts over the past few months.  Efforts to market the Debtors' business as a going concern were not successful, and as a result, the Debtors, in an exercise of their business judgment, determined to pursue a post-petition sale of their property through an orderly liquidation process.

8.      I submit this Declaration to describe the Debtors' background and the circumstances that led to these chapter 11 cases.  I also submit this Declaration in support of the relief requested by the Debtors in the "first day" motions filed with the Court (collectively, the "First Day Pleadings").

9.      By the First Day Pleadings, the Debtors seek to, among other things:

a.      obtain approval of the joint administration of the Debtors' chapter 11 cases;

b.      obtain interim (and later final) approval of debtor in possession financing and the use of cash collateral;

c.      obtain approval of certain creditor matrix and noticing procedures;

3

      d.      authorize payment of certain tax obligations;

      e.      ensure the continuation of the Debtors' cash management system without interruption;

      f.      extend certain deadlines for filing schedules of assets and liabilities and statements of financial affairs;

      g.      retain Epiq Corporate Restructuring, LLC as claims and noticing agent; and

      h.      set a hearing on the first day motions.

10.     I am familiar with each of the First Day Pleadings.  Absent the relief requested in the First Day Pleadings, I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to consummate a value-maximizing sale transaction.  I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and minimize disruptions, thereby permitting the Debtors to preserve and maximize value while pursuing one or more section 363 sales.  Finally, I believe that the First Day Pleadings capture relief that is critical to the success of these cases.

11.     This Declaration is divided into two parts.  **Part I** describes the Debtors' business, history, and the circumstances leading to the commencement of these chapter 11 cases.  **Part II** summarizes the First Day Pleadings and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the Debtors' estates, as applicable.

## I.    DESCRIPTION OF THE DEBTORS

### A.    The Debtors' Businesses and Property

12.     The Debtors' history traces back to the establishment of a preclinical contract research organization ("CRO") by Battelle Memorial Institute ('Battelle") in 1979, focused on efficacy and safety testing of biological and chemical test articles.   In 2021, AmplifyBio, LLC

4

("AmplifyBio") was spun out of Battelle and after obtaining equity financing, was established as an independent, separate entity to pursue the commercial marketplace and expand its service offerings to include advanced analytics, process development, and manufacturing services.   In 2022, AmplifyBio acquired a portfolio of patents and other intellectual property from PACT Pharma, Inc. and integrated and managed the portfolio through a wholly owned subsidiary, ADOC SSF, LLC ("ADOC").   The acquisition increased the Company's intellectual property base and expertise in advanced gene therapy discovery and optimization.     In February 2024, the Company achieved a significant milestone by opening the Advanced Manufacturing Enablement Center (AMEC) in New Albany, Ohio—a 350,000 square foot facility designed to provide flexible, multi-modality cGMP manufacturing suites for cell therapy, plasmid, mRNA, and gene editing products. This facility, along with the Company's other laboratory and vivarium resources, enabled AmplifyBio to offer a comprehensive suite of services supporting the entire therapeutic development pipeline.

13.    The Company's integrated service model was built around three core pillars:

a.    providing end-to-end research and development services, including product characterization, process scale-up, assay development, and analytical support;

b.    delivering preclinical CRO services, including pharmacokinetics, biodistribution, toxicity, and immunological assessments; and

c.    offering flexible, state-of-the-art manufacturing infrastructure and quality systems to support the scale-up and commercialization of advanced therapies.

14.    These pillars focused around three aspects of the business: ADOC (which focused on discovery, optimization and characterization of  drugs, including biological profiling, immune modulation, receptor profiling and protein engineering, and research use manufacturing for cell and mRNA products, among others); ASET (which focused on safety, efficacy and the toxicity of

drugs, with specific efforts around when the drug is active in the system, including, but not limited to, bioavailability and half-life, imaging, and tumorgenicity through a state of the art, 220,000 square foot molecular and immunological bioanalytic laboratory including 64 vivarium rooms); and AMEC (which focused on the application of advanced drug characterization through flexible manufacturing to allow clients to customize solutions that scale with their development milestones from concept to commercialization). AmplifyBio's approach aimed to free clients from traditional manufacturing and research issues by offering staffing integrations for more control over processes, timelines, and improved cost of goods.

15.     ADOC SSF, LLC is a wholly owned subsidiary of AmplifyBio, who is its managing member.   ADOC is fully integrated into these operations, sharing in the scientific, operational, and financial activities of AmplifyBio as its parent company. The Debtors rely on a combination of patent applications, patents, trademarks, and contractual provisions to protect the Debtors' proprietary rights.  The Debtors believe that to have a competitive advantage, the Debtors must develop and maintain the proprietary aspects of the Debtors' processes. The Debtors own equipment at their real property location located at 1425 NE Plain City-Georgeville Rd, JM-10, West Jefferson, Madison County, Ohio (the "Real Property"), and own certain equipment left at their leased New Albany location.

### B.     Restructuring Processes and Capital Structure

16.     Despite its technical achievements and strategic investments, the Company has faced persistent financial and operational challenges. The Company's business model, which requires significant ongoing investment in facilities, technology, and scientific talent, has resulted in high fixed and variable costs. The expansion of the AMEC facility and the acquisition of advanced therapy expertise demanded substantial upfront capital outlays, further straining the

Company's liquidity. The Debtors incurred net losses of $74 million in 2024, $56 million in 2023, and $26 million in 2022.  By early 2025, the Debtors had cash and cash equivalents of $3 million, and over $30 million in unsecured obligations on a consolidated basis.

17.    The Company's revenue streams, primarily derived from contract research, manufacturing services, and strategic partnerships, have not scaled quickly enough to offset the Company's substantial expenditures. The long timelines and high costs associated with bringing advanced therapies to market have contributed to delayed revenue realization and negative cash flows. As a result, the Company has experienced mounting financial obligations and increasing pressure on its liquidity position.

18.    In response to these challenges, the Company's leadership implemented a series of cost-cutting and restructuring initiatives, including workforce reductions, operational streamlining, and the decommissioning of non-core assets. In late 2024, the Company closed its San Francisco location, laid off all employees at this location, and reduced its workforce at its Ohio locations by approximately 25%.   Despite these efforts, the Company's liquidity position continued to deteriorate, threatening its ability to continue as a going concern.  By early February 2025, the company was in default with its prepetition secured lender, Hercules Capital, Inc. Hercules and the Debtors had previously entered into a Loan and Security Agreement dated December 27, 2022 (as thereafter amended, the "Prepetition Loan Agreement"), pursuant to which Hercules agreed to loan up to $50,000,000 to Debtors, and the current principal balance is $28,071,890.43, together with interest, costs, fees, and expenses. The Prepetition Loan Documents (as defined below) were assigned by Hercules to Battelle on April 14, 2025.

19.    When the Debtors entered into the Prepetition Loan Agreement with Hercules, the loan was to be made in two tranches:  a first tranche in the amount of $30,000,000, and a second

7

tranche in the amount of $20,000,000 if certain conditions precedent were met. The Debtors did not meet such conditions precedent, and the second tranche was not advanced. The loan was secured by a mortgage on the Real Property, a fixture filing, a blanket lien on the Debtors' personal property, a blocked account agreement, liens on the Debtors' cash and intellectual property, and all other collateral described in the loan documents. The Debtors entered into a series of interim forbearance agreements with Hercules (and later, Battelle) to allow for the Debtors to sustain until the Petition Date. In addition, the Debtors entered into approximately $6.1 million in convertible promissory notes from previous company investors, including Battelle Services Company, Inc., KAVRA 14 LLC, Kavra 14-D, LLC, and Battelle Services Company, Inc. in February and March 2025 to help sustain liquidty.

20.     With the support of its advisors and secured lender, the Debtors undertook a comprehensive review of strategic alternatives. The Company appointed me as Chief Restructuring Officer, actively sought to secure additional capital through equity or debt financing, strategic partnerships, and out-licensing of proprietary technologies. In parallel, the Company explored a potential process to market and sell its business as a going concern, engaging with a broad range of potential acquirers and investors. The Company sought to showcase the Company's state-of-the-art manufacturing infrastructure, technical expertise, and integrated service offerings to attract interest from industry participants. The Company also aimed to leverage the Company's intellectual property and operational capabilities through collaborations and licensing arrangements. Despite these efforts, AmplifyBio was unable to secure a going concern sale or a sufficient capital infusion to stabilize operations.

21.     By April 2025, the Debtors, together with their advisors, determined that operations were no longer viable. At the beginning of April 2025, the Debtors terminated all of their

#36211962v1
36211997.1

remaining employees.   26 of these former employees, including J. Kelly Ganjei, the Chief Executive Officer, and the Company's controller, Jason Fehlner, have active consulting agreements as of the Petition Date and continue to advise and assist the Company to ensure smooth sale processes and an orderly wind down.  The agreements have various end dates coinciding with the completion of activities relevant to each contractor.  Overall, the Debtors determined in their business judgment that selling the Debtors' assets as a whole or in pieces after operations were terminated was the best way to preserve the value of the Debtors' assets for the benefit of all stakeholders.

22.     When the Debtors began to wind down their operations, the Debtors also ensured that the various animals the Debtors cared for as part of their research efforts were provided for and transferred to new locations in accordance with United States Department of Agriculture ("USDA") regulations in an efficient manner to maximize value.  Through cooperation with their secured lender, the Debtors worked to donate all animals that could not be sold pursuant to USDA regulations.   The Debtors also engaged in a competitive bidding process for the sale of approximately 300 non-human primates in April 2025, and executed this sale in late April 2025. Battelle consented to such sale and released their lien on the animals.  As of the Petition Date, all of the non-human primates were shipped from the Debtors' locations to the purchaser; however, upon delivery, the purchaser has an inspection period to identify any animals that do not meet its standards.  This period has not yet expired as of the Petition Date, but no animals will be returned to the Company.  No animals remain in the care or possession of the Debtors.

23.     The Debtors also explored various other potential opportunities to sell certain of their assets prepetition, but none of these opportunities materialized prior to the Petition Date. Given the Debtors' ongoing losses and cash usage, and lack of access to incremental capital, it

9

became apparent that a going concern solution was not viable, and the Debtors determined that an orderly sale and liquidation process through a bankruptcy process may be necessary.  In May 2025, the Debtors engaged Hilco Commercial Industrial, LLC and certain of its affiliates to sell the Real Property, the Debtors' machinery and equipment, and Debtors' intangible assets and intellectual property through an orderly sale process, and Hilco is already at work moving such potential sale opportunities forward.  The Debtors will file one or more sale and/or bid procedures motions outlining a process for such sales in the first few weeks after the Petition Date.

24.     To fund the chapter 11 cases and the various sale processes the Debtors intend to pursue, the Debtors require immediate access to additional liquidity.  Accordingly, and as discussed in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Debtors In Possession to Obtain Post-Petition Financing; (ii) Authorizing the Use of Cash Collateral; (iii) Granting Liens and Superpriority Administrative Expense Status, (iv) Modifying the Automatic Stay, (v) Scheduling a Final Hearing, and (vi) Granting Related Relief* (the "DIP Motion"), and my declaration in support of the DIP Motion, each filed contemporaneously herewith, the Debtors are requesting authority to obtain senior secured postpetition financing on a priming basis with respect to the Real Property (the "DIP Facility") pursuant to the terms and conditions set forth in the Orders and the DIP Loan Documents, as defined in the DIP Motion.  I believe that the DIP Facility is appropriate and in the Debtors' best interest.  Specifically, Battelle (the "DIP Lender"), has agreed to fund an amount of up to $2,500,000, and the Debtors are also seeking authority to use cash collateral.  The Debtors believe that the DIP Facility will provide the Debtors with the necessary financial runway and flexibility to run a thorough sale process and consummate one or more transactions over the coming months.

#36211962v1
36211997.1

## II.     SUMMARY OF THE FIRST DAY PLEADINGS[2]

25.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings.  Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed therein.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to prosecute a value-maximizing sale and liquidation process and conduct this efficiently, thus permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.  The Debtors have limited their requests for immediate authority to those circumstances where a lack of relief would cause harm to the Debtors and their estates.  Set forth below are the reasons why I believe it is imperative that the Court grant the relief requested.

### A.     Joint Administration Motion

26.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these chapter 11 cases for procedural purposes only.  The Debtors operate as an integrated business with common ownership and control.  The Debtors also share the same financial and operational systems.  As a result, many, if not all, of the motions, hearings, and orders that will arise in these cases will affect all Debtors.  Therefore, I believe joint administration of these chapter 11 cases will reduce fees and administrative burdens by avoiding duplicative filings, objections, notices, and hearings.  This, in turn, would save the Court, the Debtors, and other parties in interest substantial time and expense when preparing and filing such documents.  Further, joint administration would protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' cases.

---

[2]     Capitalized but undefined terms used in this section shall have the meanings ascribed to such terms in the applicable First Day Pleading.

#36211962v1
36211997.1

27.     Because the Debtors seek only administrative, not substantive, consolidation of the estates, joint administration would not adversely affect the Debtors' respective estates.  I believe the relief requested in the Joint Administration Motion will not only preserve individual creditors' rights, but also provide those creditors the benefit of cost reductions associated with joint administration.

### B.     Matrix Procedures and Notice Motion

28.     In this motion, the Debtors seek, among other things, authority to seal certain personally identifiable information for the Debtors' individual creditors and interest holders, authority to file a consolidated creditor matrix.  The Debtors submit that it is appropriate to redact from any paper filed or to be filed with the Court in these chapter 11 cases the home addresses of the Debtors' individual creditors and interest holders because such information could be used, among other things, to perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts.  The Debtors propose to provide an unredacted version of the Creditor Matrix and any other applicable filings in accordance with the terms of the proposed order granting the motion.  Further, because the Debtors share many creditors and the Debtor entities have minimal to no operations, filing a consolidated versions of the creditor matrix will streamline these cases.  For the foregoing reasons, the Debtors respectfully request that the relief set forth in this motion be approved.

### C.     Cash Management Motion

29.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue to use their existing cash management system (the "Cash Management System"), including existing bank accounts as identified in the Cash Management Motion (the "Bank Accounts"), (b) honor certain prepetition obligations related thereto, and

#36211962v1
36211997.1

(c) maintain their existing business forms, (ii) waive certain requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines (defined below), and (iii) granting related relief.

30.    As part of the relief requested in the Cash Management Motion, and to ensure that their transition into chapter 11 is as smooth as possible, the Debtors seek entry of orders authorizing the Debtors to, among other things, (a) maintain and continue using in the ordinary course their Cash Management System, including the Bank Accounts, in the same manner and with the same account numbers as are currently employed, (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtor in possession accounts, (c) deposit funds in, and withdraw funds from, the accounts by all usual means, including checks, wire transfers, and other methods, (d) pay service charges and other fees due to the banks including, without limitation, any prepetition fees and any other fees for prepetition transactions that are charged to the Debtors on or after the Petition Date, and (e) perform their obligations under the documents and agreements governing the applicable accounts.

31.    The continued use of the Cash Management System and the Bank Accounts during the pendency of the Chapter 11 Cases is essential to the Debtors' operations.  The Debtors employ the Cash Management System and Bank Accounts to maximize efficiencies and the value of their businesses and to collect, transfer, and disburse the funds generated by their operations.  Using the Cash Management System and Bank Accounts, the Debtors are able to collect and transfer cash efficiently to satisfy their financial obligations.  The Cash Management System and Bank Accounts facilitate the Debtors' cash forecasting and reporting, enable the Debtors to monitor the collection and disbursement of funds, and maintain control over the administration of their bank and investment accounts.  It would be extremely burdensome and expensive to establish and maintain a different Cash Management System and different Bank Accounts.  Accordingly, the

#36211962v1
36211997.1

Debtors request to continue their existing Cash Management System and the Bank Accounts without disruption.

32.     Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations.  This would cause significant harm to the Debtors' business the value of their estates.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

### D.     Taxes Motion

33.     Pursuant to the Taxes Motion, the Debtors seek, among other things, authority to pay certain prepetition taxes and related relief.  In the ordinary course of business, the Debtors are subject to various taxes (including sales taxes), regulatory fees and assessments, and related obligations (collectively, the "Taxes") that are payable directly to numerous taxing authorities (collectively, the Taxing Authorities").  The Debtors are seeking authority (but not direction) to pay various unpaid taxes, fees, and related obligations that accrued or assessed before the Petition Date, and are actively working to reconcile certain undetermined amounts or complete missing filings.

34.     The Debtors' failure to pay the Taxes could have a material adverse impact on the Debtors' ability to maximize the value of their assets for the benefit of all stakeholders.  Even if the Debtors could avoid payment of certain Taxes, I believe that the collateral consequences on the business would vastly exceed whatever modest short-run cost savings the Debtors might achieve.  Additionally, any attempt to collect the Taxes from the Debtors' managers and officers has the potential to divert the attention of those individuals away from the Debtors' efforts to maximize the value of their assets through the postpetition sale process.  Accordingly, for the reasons stated herein and in the Taxes Motion, I believe the requested relief is appropriate and the

14

Taxes Motion should be approved.

### E.    Schedules and Statements Extension Motion

35.     I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors to file with the Court within 14 days of the Petition Date: (a) their schedules of assets and liabilities; (b) their statements of financial affairs; and (c) their lists of executory contracts and unexpired leases (collectively, the "Schedules and Statements").

36.     By the Extension Motion, the Debtors are seeking entry of an order extending the time for filing the Schedules and Statements for an additional 14 days (for a total of 28 days from the Petition Date).  The Debtors have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but the Debtors believe that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

37.     The Debtors are filing the Extension Motion because it has numerous creditors and other interested parties, and the Debtors require additional time to accurately review and report all of the required information.  The Debtors estimate that it has approximately 2,000 creditors and other interested parties.  Given the size and complexity of their business and the fact that certain prepetition invoices have not yet been received and/or entered into the Debtors' financial systems, the Debtors have not had the opportunity to gather all the necessary information to prepare and file their Schedules and Statements.  An extension will allow the Debtors to properly prepare this information in an accurate and efficient manner.  Accordingly, for the reasons stated herein and in the Extension Motion, I believe the requested relief is appropriate and the Extension Motion should be approved.

#36211962v1
36211997.1

### F.      Epiq Retention Application

38.      The Debtors seek entry of an order authorizing the Debtors to employ Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent in accordance with the terms and conditions set forth in the engagement letter attached to the Epiq Retention Application as Exhibit A. The appointment of Epiq as claims and noticing agent is in the best interest of the Debtors' estates and their creditors because the distribution of notices and the processing of claims will be expedited. I believe that the relief requested in the Epiq Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### G.      Expedited Hearing Motion

39.      The First Day Pleadings described above involve matters that require an emergency and expedited hearing and are of the type typically heard on an emergency or expedited basis.  Any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' estates and their transition into operating as chapter 11 debtors in possession.  Thus, the Debtors are requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing as soon as the Court's schedule will permit, and that the Court approve the form of notice thereof.

40.      Upon entry of an order approving the Expedited Hearing Motion, the Debtors propose to serve the "Notice of Expedited Hearing on First Day Motions," which is attached as Exhibit A to the Expedited Hearing Motion, as soon as possible to the various notice parties identified in the Expedited Hearing Motion, including each party whose rights are affected by the First Day Pleadings.

### CONCLUSION

41.      I have consulted with the Debtors' advisors regarding the First Day Pleadings and understand each of the First Day Pleadings and the relief requested therein.  To the best of my

16

knowledge and belief, the factual statements contained in each of the First Day Pleadings are true

and accurate and each such factual statement is incorporated herein by reference.  Failure to grant

the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm

to the Company, their business, and their estates.  Accordingly, for the reasons set forth herein and

in each respective First Day Pleading, the Court should grant the relief requested in each of the

First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Dated:  May 16, 2025                                    /s/ Kasey Rosado
                                                        Kasey Rosado
                                                        Chief Restructuring Officer

17